IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PATRICK DUNLAP,                    )
                                   )    CASE NO. 1:20-2310
                                   )
             Plaintiff,            )
                                   )
      vs.                          )    MAGISTRATE JUDGE
                                   )    JONATHAN D. GREENBERG
                                   )
COMMISSIONER OF SOCIAL             )
SECURITY,                          )    **MEMORANDUM OF OPINION AND**
             Defendant.            )    **ORDER**

Plaintiff, Patrick Dunlap ("Plaintiff" or "Dunlap"), challenges the final decision of Defendant,

Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i),

423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent

of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

## I. PROCEDURAL HISTORY

On January 4, 2018, Dunlap filed an application for SSI, alleging a disability onset date of

September 29, 2017 and claiming he was disabled due to trauma to the head, deterioration of the neck and

spine, bipolar, post-traumatic stress disorder, depression, injury to fingers in left hand, and seizures.

Transcript ("Tr.") at 412, 440. The application was denied initially and upon reconsideration, and Dunlap

requested a hearing before an administrative law judge ("ALJ"). Tr. 333.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On April 10, 2019 an ALJ held a hearing, which was continued at Dunlap's request so he could obtain representation (Tr. 261-273), and a second hearing was held on October 30, 2019, during which Dunlap, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 219-260.  On January 13, 2020, the ALJ issued a written decision finding that Dunlap was not disabled.  Tr. 11-25.  The ALJ's decision became final on September 17, 2020, when the Appeals Council declined further review.  Tr. 1-4.

On September 13, 2020, Dunlap filed his Complaint to challenge the Commissioner's final decision.  Doc. No. 1.  The parties have completed briefing in this case.  Doc. Nos. 16, 18.  Dunlap asserts the following assignments of error:

> (1)  Whether the ALJ failed to address plaintiff's non-exertional limitations which reduce or eliminate Mr. Dunlap's capacity for light work.

> (2)  Whether the ALJ erred in relying on vocational expert testimony to find plaintiff capable of other work at step five of the sequential evaluation process, as the ALJ did not resolve conflicts between the expert's testimony and the Dictionary of Occupational Titles.

Doc. No. 16, p. 1.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Dunlap was born in 1969 and was 48 years-old, making him a "younger" person under social security regulations at the time he filed his application.  Tr. 24.  *See* 20 C.F.R. § 416.963(c).  He has at least a high school education and is able to communicate in English.  Tr. 24.  He has past relevant work as a laborer, grinding and polishing, and as a centerless grinder set-up operator.  Tr. 23.

### B.    Relevant Medical Evidence[2]

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

In June 2017, Dunlap had a follow up appointment for his history of seizures.  Tr. 547.  Upon exam, he had a normal gait and normal musculoskeletal and neurologic functioning.  Tr. 547-548.

On September 29, 2017, Dunlap had an initial mental health evaluation and was noted to have a steady gait and no gross motor deficits.  Tr. 502.

On October 30, 2017, Dunlap saw Dr. Todd Wagner, M.D., for a physical exam to determine suitability for participation in a drug treatment program.  Tr. 513.  He was taking his prescribed Flexeril and Naprosyn for back pain but was reluctant to have recommended back surgery due to the negative experience of others.  Tr. 513.  Dr. Wagner noted a diagnosis of chronic cervical/lumbar spine pain and suggested Dunlap consider referral to a pain management clinic.  Tr. 513.

On November 8, 2017, Dunlap saw Tracy Greathouse, R.N., for a follow up for his low back pain that radiated down both legs, causing numbness and tingling.  Tr. 544-545.  This issue had been ongoing for years.  Tr. 545.  His Naprosyn was not helping much; Flexeril, which he had taken in the past year, helped more.  Tr. 545.  Upon exam, he ambulated without difficulty, had good strength, and decreased sensation in his right leg compared to the left.  Tr. 545.  He was diagnosed with chronic low back pain with left-sided sciatica based on his history.  Tr. 545.  Greathouse ordered an MRI, recommended he follow up with neurology afterwards, and prescribed Flexeril.  Tr. 545.

On November 27, 2017, Dunlap saw Certified Nurse Practitioner Rikki Johnson at MetroHealth Medical Center's Physical Medicine Department.  Tr. 541.  He reported having headaches and seizures; his last seizure had been in May 2017.  Tr. 541-542.  Upon exam, he had 4/5 muscle strength in his lower extremities and 5/5 elsewhere.  Tr. 543.  Johnson referred him to physical therapy and pain management for his chronic low back pain.  Tr. 544.

On December 26, 2017, Dunlap had a physical therapy evaluation for low back pain.  Tr. 537. X-rays of his lumbar spine showed six lumbar vertebrae (one more than usual) with a partial

3

sacralization of L6 on the left and mild disc space narrowing at L5-6 with mild degenerative changes.
Tr. 538.  Dunlap reported pain in his low back radiating down both legs, rated 8/10, and tingling in his
legs.  Tr. 538.  He reported difficulty donning/doffing his shoes, dressing, walking due to back pain, and
trouble sleeping.  Tr. 538.  His pain worsened with prolonged walking.  Tr. 539.  Upon exam, he had a
decreased lumbar range of motion, full muscle strength except in his left psoas and quadriceps
ligaments, in which his strength was 4/5, and decreased sensation to light touch on his left leg.  Tr. 539.
He had a positive seated slump test on the left and his gait was independent but antalgic and slow.  Tr.
539-540.  He was given a home exercise program and enrolled in once-a-week physical therapy sessions
for ten weeks.  Tr. 540.

On February 15, 2018, Dunlap saw Ann Harrington, A.P.R.N., a physical medicine and
rehabilitation (PM&R) specialist, for an evaluation.  Tr. 618-619.  Upon exam, he was in no acute
distress and had spinal tenderness, full strength, limited motion of his back, positive straight leg raise
testing, a negative slump test, and decreased left arm sensation.  Tr. 621-622.  He had a non-antalgic
gait, he was able to walk on his toes, he had trouble walking on his left heel due to an ankle injury, and
he had a stable tandem walk.  Tr. 621.  Harrington wrote, "The pain in both back and neck is
disproportionate to the manipulation done" during the exam.  Tr. 622.  She started him on Neurontin.
Tr. 622.

On March 7, 2018, Dunlap saw Jeff Kirschman, M.D., for a consultative exam.  Tr. 564.  Dunlap
reported that his last seizure had been in February 2018, the one before that had been in June 2017, and
that he was on medications to control them.  Tr. 564.  He described ongoing cervical and lumbar spine
pain for the last 10-15 years following a motor vehicle accident.  Tr. 564.  His condition had been
aggravated the previous year after he had been assaulted.  Tr. 564.  His pain ranged from 3/10 to 10/10,
leaving him bedridden at times.  Tr. 564.  His pain radiated to his left leg and he had occasional

4

numbness and tingling in his left leg.  Tr. 564.  He had occasional pain and stiffness in his right ankle

from a fracture he sustained in 2016, especially after prolonged standing and walking.  Tr. 565.  His left

foot swelled, although he did not know the reason for it.  Tr. 566.  Dunlap was living in a "sober house"

and reported "difficulty bathing due to back pain."  Tr. 566.  He could shower and dress and did not

perform any chores.  Tr. 566.  He "ties a bow poorly."  Tr. 571.  Upon exam, his gait was "slow, stiff,

and slightly hunched forward" and he was unable to walk on heels and toes due to pain.  Tr. 567.  He

was unable to perform a full squat, getting about one-quarter of the way down.  Tr. 567.  He did not use

an assistive device, needed no help changing for the exam or getting on and off the exam table, and he

was able to rise from the chair using his arms for support.  Tr. 567.  He had full strength in his

extremities except 4/5 strength in his lower left extremity and his ability to grasp with his left hand was

abnormal.  Tr. 570.  Straight leg raise testing was negative.  Tr. 567.  He had limited motion in his

cervical and lumbar spine, bilateral hips, knees, and shoulders, and frozen fingers on his left hand.  Tr.

568, 571-572.  He had impingement of his left hip and right shoulder with range of motion and

tenderness in the right deltoid and lateral acromion.  Tr. 568.  Neurologically, he had decreased

sensation over his "left side globally" and slight weakness of his left side extremities as compared to his

right.  Tr. 568.  Dr. Kirschman opined that Dunlap had a "marked" limitation lifting and carrying and

pushing and pulling; a "moderate" limitation standing, walking, reaching, and using fine motor skills; a

"mild" limitation using his feet; and he should avoid environmental hazards.  Tr. 569.

On April 5, 2018, Dunlap completed his tenth and last physical therapy session.  Tr. 604.  He had

no significant change in pain or range of motion of his cervical and lumbar spine.  Tr. 605.  On April 10,

he had a normal electroencephalogram.  Tr. 602-603.

On May 10, 2018, Dunlap saw Nurse Harrington for a follow up.  Tr. 594.  Upon exam, he was

in no acute distress, had 5/5 muscle strength in his bilateral lower extremities, intact sensation, was able

to stand on heels and toes, and had exquisite tenderness of his bilateral paraspinal muscles.  Tr. 596.

Harrington ordered a lumbar MRI.  Tr. 597.  An MRI taken on May 29 showed mild T2 hyperintensity

in the interior endplates at L4 and L5, "likely acute worsening of chronic degenerative changes," disc

desiccation at L4-L5 with vacuum disc phenomenon, mild disc height loss, and a small disc bulge with

no canal stenosis and mild bilateral foraminal stenosis.  Tr. 840.  The impression was degenerative disc

disease at L4-5 with acute reactive changes in the adjacent anterior endplates.  Tr. 840.

On June 1, 2018, Dunlap went to the MetroHealth's Express Care Clinic for swelling and pain in

his left foot for the last three days.  Tr. 951.  He did not describe any recent injury or trauma.  Tr. 951.

Upon exam, he had tenderness, mild edema, and warmth in his foot.  Tr. 953.  He had a normal range of

motion in his ankle.  Tr. 953.  The provider suspected gout and ordered lab work.  Tr. 953.  On June 7

Dunlap returned, reporting left foot and ankle pain and stating that he had rolled his left ankle while

stepping onto a curb about 10 days prior.  Tr. 975.  His lab work had been normal.  Tr. 975.  Upon exam,

he had slight swelling of the dorsum of his left foot and a decreased range of motion and generalized

tenderness in his left ankle.  Tr. 977.  An x-ray of his left ankle and foot showed mild osteoarthritis due

to minimal degenerative spurring around the ankle.  Tr. 977.  He returned the next day; he had just

started his Motrin that morning and was advised to wear a post-op shoe and use crutches to relieve pain.

Tr. 807-809.  Upon exam, he had mild edema and tenderness in his left foot and a normal range of

motion in his ankle.  Tr. 809.  He was advised to follow up with a podiatrist or primary care physician.

Tr. 809.

On July 16, 2018, Dunlap saw podiatrist John Salamone, D.P.M, for his ongoing left foot pain.

Tr. 1048.  Dunlap stated that, since his injury, his left foot has been red, hot, swollen and painful (8/10),

and that he is unable to bear full weight on it.  Tr. 1048.  He had been taking Motrin and using crutches

and ice.  Tr. 1048.  Upon exam, Dunlap had pain with foot range of motion and no pain with ankle range

of motion, and pain with palpation over the dorsal first and second rays and with the medial/lateral squeeze test.  Tr. 1049.  Dr. Salamone took x-rays, which showed a stress fracture of the second metatarsal bone of his left foot.  Tr. 1049.  Dr. Salamone ordered Dunlap to rest his foot, ice and elevate it, and bear weight as tolerated.  Tr. 1049.  He gave Dunlap a surgical boot to wear and instructed gradual return to a walking shoe as tolerated.  Tr. 1049.  He was to follow up in 3-4 weeks with an additional x-ray.  Tr. 1049.

On July 20, 2018, Duncan went to the MetroHealth Express Care Clinic complaining of tingling in his right arm for the past week.  Tr. 1054.  He reported having chronic problems with pain in his neck after a motor vehicle accident five years before.  Tr. 1054.  Ibuprofen and gabapentin provided limited relief.  Tr. 1054.  The tingling started in his neck/upper shoulder and sometimes radiated down to his right middle finger.  Tr. 1054.  Upon exam, he had a full range of motion in his neck, normal sensation, and intact strength in his upper extremities.  Tr. 1055.  His medications were adjusted and he was given a home exercise program.  Tr. 1055, 1057.

On August 8, 2018, Dunlap saw Dr. Salamone for a follow-up.  Tr. 1064.  He had swelling in his left foot.  Tr. 1064.  X-rays showed routine healing of the stress fracture with callus.  Tr. 1064.  Dr. Salamone replaced Dunlap's surgical shoe with a cast boot.  Tr. 1064.

On August 21, 2018, Dunlap saw Michael Harris, M.D., at MetroHealth's PM&R department. Tr. 1079.  Dr. Harris noted that Dunlap was a patient of Nurse Harrington's but was seeing Dr. Harris that day due to a missed appointment.  Tr. 1079.  Dr. Harris reviewed Dunlap's history of chronic neck and back pain, which he described as being without radiation, numbness, weakness or tingling, and described Dunlap's May 2018 lumbar MRI as showing significant degenerative disc disease at the L4-5 level.  Tr. 1079-1080.  Upon exam, Dunlap had a slight limitation in his cervical range of motion and no radicular signs.  Tr. 1082.  He had a "very limited" lumbar range of motion in his lumbar spine and Dr.

7

Harris wrote, "I cannot explain why he will not go beyond that point [of 30 degrees flexion] except that it is painful, but anatomically he should have a lot better flexion." Tr. 1082. He had negative straight leg raise testing, tenderness in his lumbosacral junction and tight paraspinals, but no spasm or trigger point. Tr. 1082. He had normal sensation and strength and diminished reflexes in both lower extremities, and he wore a walking boot on his left leg. Tr. 1082. Dr. Harris diagnosed chronic spondylogenic low back pain due to severe degenerative disc disease at L4-5, probable cervical spondylosis, and a recent left ankle sprain. Tr. 1082. He ordered a cervical x-ray to be reviewed at Dunlap's follow-up appointment with Harrington, prescribed a TENS unit, and adjusted his medications. Tr. 1082-1083. A cervical x-ray showed degenerative changes: disc space narrowing at the C5-6 and C6-7 with marginal osteophytes at multiple levels. Tr. 1088.

On August 27, 2018, Dunlap returned to Dr. Salamone. Tr. 1089. He had no new complaints and reported decreased pain and swelling in general. Tr. 1089. Upon exam, Dr. Salamone commented that the left foot swelling was "resolving nicely." Tr. 1089. X-rays showed a healing stress fracture of the left second metatarsal and a suspicion of a healing fracture of the left third metatarsal. Tr. 1092. Dr. Salamone assessed the healing as incomplete and directed him to continue to wear his cast boot for 2-3 weeks. Tr. 1089.

On September 5, 2018, Dunlap returned to Nurse Harrington for a follow-up. Tr. 1101. He wasn't sure how to use his TENS machine and hadn't yet used it. Tr. 1101. He reported chronic low back pain radiating to both legs and neck pain radiating to his left arm. Tr. 1102-1103. That day his neck pain was worse than his back pain. Tr. 1106. Harrington commented that his reports of burning pain throughout his spine were not explained by his recent lumbar MRI and she suspected a chronic pain syndrome. Tr. 1106. She continued his medications, increased his home exercise program, and ordered

an MRI of his cervical spine.  Tr. 1106.  The MRI showed multilevel mild to moderate degenerative changes without cord compression or cord edema.  Tr. 1110.

On September 17, 2018, Dunlap saw Dr. Salamone for a follow-up.  Tr. 1112.  Dunlap reported having almost no pain but that swelling persisted.  Tr. 1112.  Dr. Salamone observed that Dunlap was wearing regular shoes at the time, not the cast boot.  Tr. 1112.  Upon exam, he had localized swelling and had no tenderness during exam or with palpations.  Tr. 1112.  X-rays showed that healing was incomplete, and Dr. Salamone recommended that Dunlap wear the protective boot during any weight-bearing activities.  Tr. 1112.  Dunlap returned on October 15, having re-injured his left foot two days beforehand bumping into a bedpost; he rated his pain 8/10.  Tr. 1135.  He had not been wearing his cast boot up until the time of his injury two days prior.  Tr. 1135.  Since his injury he had started wearing his walking boot to alleviate the pain.  Tr. 1135.  Dr. Salamone gave Dunlap a surgical shoe to wear.  Tr. 1135.

On November 14, 2018, Dunlap saw Harrington for a follow-up.  Tr. 1148.  He had been using his TENS unit and it had helped him "a lot": he had less pain, had reduced the amount of pain medication he took, and he was able to be "more functional."  Tr. 1149.

On December 8, 2018, Dunlap was taken to the emergency department for right leg pain after he was a car accident earlier that day.  Tr. 1202.  Imaging showed a comminuted fracture of his right tibia, and he underwent surgery for placement of an external fixation device to stabilize it the following day and an open reduction internal fixation procedure on December 22.  Tr. 1305-1312.  After surgery he was in a wheelchair.  Tr. 1475.  He was sent to a rehabilitation facility where he had physical therapy; at an orthopedic doctor's appointment on January 11, 2019, he remained non-weight-bearing on his right leg.  Tr. 706.

On February 27, 2019, Dunlap had a follow-up with his surgeon, Damien G. Billow, M.D.  Tr.

9

768.  Dunlap reported some persistent pain and swelling in his right lower leg, some weakness in his foot, and no numbness or tingling.  Tr. 768.  Upon exam, he had a well-healed incision and minimal swelling, intact sensation, and mild tenderness to palpation over the fracture site and decreased range of motion secondary to pain.  Tr. 768-769.  He was assessed with routine healing and instructed to be non-weight bearing on his right leg for another month.  Tr. 769.  He continued physical therapy with a home care therapist.  Tr. 768.

On March 28, 2019, Dunlap saw his primary care physician, Henry Tucker, M.D., and stated that he was very troubled by recurrent edema and moderate pain in his right leg; he was going to be doing more weight bearing and wanted a cane, rather than a walker, so Dr. Tucker prescribed him a cane to assist with ambulation.  Tr. 1458-1459.

On April 17, 2019, Dunlap had a follow-up with Dr. Billow and reported that he was working on range of motion.  Tr. 1241.  Upon exam, he had normal sensation, no tenderness, minimal swelling, and a stable knee.  Tr. 1241.  Dr. Billow commented that Dunlap was doing well and that he was very happy with Dunlap's progress.  Tr. 1241.  He instructed Dunlap to do weightbearing, range of motion, and strengthening exercises as tolerated.  Tr. 1241.  On April 25, Dunlap had a physical therapy assessment at the Cleveland Clinic.  Tr. 1322.  He had begun bearing weight on his right leg as tolerated while using crutches but he still primarily used a wheelchair.  Tr. 1322-1323.  Upon exam, he had edema of his right leg below the knee.  Tr. 1323.

On May 15, 2019, Dunlap saw Harrington for a follow-up.  Tr. 1175.  Upon exam, he had minimal edema in his lower extremities and his gait was "limited, limping, cane."  Tr. 1181.  Harrington continued his medications and advised he continue with his home exercise program and using his TENS unit.  Tr. 1182.  On May 16, Dunlap saw Dr. Tucker, reporting that his right leg swelling and pain persisted and that he had impaired flexion of his right foot.  Tr. 1452.  Upon exam, he had edema,

ambulated "with crutch," had abnormal muscle tone, and had a sensory deficit.  Tr. 1453.  Dr. Tucker suspected peripheral motor nerve damage and/or vascular insufficiency and referred him for a vascular medicine evaluation.  Tr. 1453.

On June 6, 2019, Dunlap had his eleventh physical therapy visit.  Tr. 1614.  He had progressed from crutches to a cane for community ambulation.  Tr. 1614.  He demonstrated difficulty with single limb stance and the therapist remarked that he would benefit from increased walking at home.  Tr. 1614. He complained of pain, 8/10, persistent right lower extremity edema, and ankle weakness.  Tr. 1614.  He was given exercises and encouraged to progress to ambulate without a device as able.  Tr. 1616.

On June 13, 2019, Dunlap saw Dr. Tucker for ongoing right leg edema.  Tr. 1451.  Dr. Tucker assessed lymphedema of his right leg, "post-traumatic, prognosis permanent," and prescribed compression stockings.  Tr. 1451.  On June 17, at a physical therapy visit, Dunlap had an antalgic gait without an assistive device.  Tr. 1638.  On June 24, at a physical therapy visit, he reported that he had "been out and about to parks, events with kids.  Doing a lot of walking.  Family encouraged increased mobility including walking, caring for yard, etc."  Tr. 1646.

On July 17, 2019, Dunlap saw Dr. Billow.  Tr. 1680.  Dr. Billow noted that he was ambulating with a cane and that he continued to go to physical therapy and was seeing improvement.  Tr. 1680. Upon exam, he had tenderness to palpation over his knee and reduced knee motion secondary to pain. Tr. 1680.  Dr. Billow gave Dunlap a steroid injection in his right knee joint.  Tr. 1680-1681.

On July 22, 2019, Dunlap had a physical therapy session and his therapist reported that he had progressed to using no assistive device and had increased cadence.  Tr. 1687.  He was still limited with walking in the community, negotiating stairs, heavy exertion, running or carrying.  Tr. 1687.

On August 5, 2019, Dunlap saw Samuel Rosenburg, M.D., a neurosurgeon at MetroHealth, for pain in his neck, back, and leg.  Tr. 1505.  His neck pain radiated to both shoulders and caused

numbness and headaches and he dropped objects from both hands.  Tr. 1505.  Upon exam, he had an antalgic gait, motor weakness of the right leg below the knee and mild weakness of the right hip flexor, negative straight leg raise testing, decreased sensation in his right leg, and absent deep tendon reflexes. Tr. 1512.  Dr. Resenburg diagnosed cervical facet pain on the right, cervical spondylosis at C5-6 and a non-compressive disc herniation at C4-5, and lumbar spondylosis and disc degeneration.  Tr. 1513.  He advised medical management and suggested that Dunlap try cervical and lumbar facet nerve blocks.  Tr. 1513.

On August 14, 2019, Nurse Harrington completed a physical medical source statement on behalf of Dunlap.  Tr. 1497-1498.  She listed no restrictions except for limiting his exposure to unprotected heights and moving machinery.  Tr. 1498.

On October 14, 2019, Dunlap saw Certified Nurse Practitioner Maureen Gallagher for a complete physical exam.  Tr. 1722.  He denied gait problems, numbness, weakness, or burning pain, and he reported pain in his knees.  Tr. 1723.  Upon exam, his muscle strength and gait were within normal limits.  Tr. 1727.  He was in no acute distress and had normal neurologic findings, including deep tendon reflexes.  Tr. 1727.

## C.    State Agency Reports

On March 15, 2018, Leigh Thomas, M.D., reviewed Dunlap's records and, regarding his residual functional capacity, opined that Dunlap could perform light-level work but was limited to standing/walking four hours of an eight-hour workday.  He could occasionally climb ramps and stairs but never ladders, ropes or scaffolds, frequently balance, stoop, kneel and crouch, occasionally crawl, frequently reach overhead with the right upper extremity, frequently handle and occasionally finger with his left hand, and had environmental restrictions.  Tr. 302-304.  On June 18, 2018, Gerald Klyop, M.D. affirmed Dr. Thomas' assessment.  Tr. 320-323.

12

**D.      Hearing Testimony**

During the October 30, 2019 hearing, Dunlap testified to the following:

- At the time of the hearing, Dunlap was living in a treatment center due to his past use of drugs and alcohol.  Tr. 227.  It is a facility for the homeless and he has lived there for 1½ years.  Tr. 227.  He goes to meetings, classes, and meditation sessions.  Tr. 227.  He has been sober for 2½ years.  Tr. 227.  His physician, Dr. Tucker, has an office in the building.  Tr. 229.

- He has a roommate and there is a common area in the building.  Tr. 229.  He does his own laundry using a machine down the hall.  Tr. 231.  He does not cook because he doesn't know how; sometimes one of his siblings will take him to the store and he'll get food that doesn't require preparation.  Tr. 231.  He doesn't have a driver's license; years ago he had one but he never renewed it.  Tr. 232.

- Once a month a Deacon picks him up so he can volunteer at a food pantry at a church for a couple of hours.  Tr. 233-234.  He puts groceries in bags and hands them out; the heaviest a bag weighs is about 5-6 pounds.  Tr. 233-234.  He goes to his teenage daughter's athletic games if they are nearby; he takes a bus or calls paratransit.  Tr. 246.  He will also visit his brother, who is at the VA hospital, and his mother.  Tr. 247.

- He graduated from high school and started college classes but had to drop out to care for his mother, who had become ill.  Tr. 232.

- He last worked for Vocational Guidance, signing in people's household donations, unloading the donations off the truck, and wiping them down.  Tr. 235.  He was doing that for a few weeks before the car accident that broke his leg.  Tr. 235.  About seven years ago he worked as a grinder and polisher making automotive parts; that is how his fingers on his left hand were injured.  Tr. 232, 236, 252.  His fingers lock up on him and he uses a ball for exercising them.  Tr. 248.  Surgery had been recommended but he was scared; in any event, he wanted to get his leg straightened out first and then he would think about fixing his hand.  Tr. 244-245.

- When asked if he could perform full time work, Dunlap stated that he could if he were sitting down.  Tr. 239.  He can't stand like he used to, he has "swelling and stuff" in his legs and his back hurts.  Tr. 239.

- He described the two surgeries on his broken right leg in December 2018.  Tr. 240-241.  They replaced his kneecap and fixed his tibia and fibula.  Tr. 240-241.  He was waiting for a date for another surgery to take the surgical hardware out; he has two rods and about 20-25 screws going down his leg that are pushing on his skin and hurt.  Tr. 240.  Since his surgery, it's been "up and down."  Tr. 241-242.  He takes gabapentin for pain, aspirin to prevent blood clots, and water pills to keep the swelling down; "it usually swells up real bad."  Tr.

241.  He has compression socks, a knee brace, and orthopedic shoes for his feet.  Tr. 241. He gets cortisone shots in his knee, back and neck.  Tr. 242.

- He has back pain, neck pain, and migraines from head trauma sustained in a car accident about five years prior to the hearing.  Tr. 243.  He uses his TENS unit every day for his neck and lower back and he gets injections.  Tr. 244, 248.

- Regarding his leg pain, standing a lot and walking a lot made it feel the worst.  Tr. 249-250. He estimated he could stand or walk about a block before needing to rest.  Tr. 250.  He does exercises, uses a cold compress and heating pad, and elevates his leg as much as he can so it won't swell so much.  Tr. 250.  During meetings, some of his counselors let him put his foot on a chair, which it helpful.  Tr. 250.

The ALJ told the VE to advise if any of her testimony contradicts the Dictionary of Occupational Titles ("DOT") and the VE stated that she would.  Tr. 253.  The VE confirmed Dunlap's past relevant work as a laborer, grinding and polishing, and as a centerless grinder set-up operator.  Tr. 238, 253-254. The ALJ then asked the VE whether a hypothetical individual with the same age, education and work experience as Dunlap could perform his past work or any other work if the individual had the following residual functional capacity: he could lift and carry, push and pull, 10 pounds occasionally and frequently; stand and/or walk 4 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can frequently balance, stoop, kneel and crouch and occasionally crawl; can perform frequent overhead reaching; and, with the left hand, can frequently handle and occasionally finger.  He could frequently be exposed to fumes, odors, dust, gasses, and poor ventilation, and never be exposed to unprotected heights, dangerous machinery, and commercial driving.  He could perform simple, routine, no stress tasks with no more than superficial interaction with supervisors, coworkers, and the public.  He cannot perform tasks that involve fast-paced production requirements, strict time requirements, arbitration, negotiation, confrontation, or directing the work of others or being responsible for the safety of others.  Tr. 254-255.  The VE testified that the hypothetical individual would not be able to perform Dunlap's past work but could perform the following representative jobs in the economy: marker and order caller.  Tr. 255.  The VE explained that

14

the jobs identified "are not specific as such by the DOT" due to the 4 hours standing and walking and sitting for 6 hours, but that the VE has observed over the course of her 30-year career that the jobs can be performed by an individual with the ALJ's hypothetical limitations.  Tr. 255.

Dunlap's attorney asked the VE whether the two jobs identified would remain if the hypothetical individual had the following, additional limitations: could stand and/or walk for 2 hours a day and would need a cane.  Tr. 256.  The VE answered that such an individual could not perform the two jobs identified or any other jobs in the light exertional category.  Tr. 256.  Dunlap's attorney asked if there were sedentary jobs the hypothetical individual could perform and the VE answered that there was.  Tr. 256-257.  The attorney added additional limitations—occasional bilateral reaching in all directions and occasional handling with the left—and the VE stated that such additional limitations would be work preclusive.  Tr. 257.  When asked about acceptable off-task behavior and absenteeism, the VE stated that chronic (lasting more than 3 months) off-task behavior above 10% and absenteeism of more than 2 days a month is unacceptable.  Tr. 258.

### III. STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c)

*and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since December 12, 2017, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: degenerative disc disease, status post fractures of the lower extremities, contractures of fingers on the left hand, epilepsy, posttraumatic stress disorder ("PTSD"), and depression (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can stand and walk for no more than four hours in an eight-hour workday; can occasionally climb ramps and stairs; can never climb ladders, ropes, and scaffolds; can frequently balance, stoop, kneel, and crouch; can occasionally crawl; can frequently reach overhead with the right upper extremity; can frequently handle with the left upper extremity; can occasionally finger with the left upper extremity; can have frequent exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation; can never be exposed to hazards such as unprotected heights, dangerous machinery, or

16

commercial driving; he is limited to simple, routine, and low stress work tasks with no more than superficial interaction with supervisors, coworkers, and the public; and he is precluded from tasks involving fast-paced production environments, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the work of others.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on June **, 1969 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 12, 2017, the date the application was filed (20 CFR 416.920(g)).

Tr. 11-25.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v.Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip*

*v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.Ohio July 9, 2010).

## VI. ANALYSIS

### A. The ALJ did not err when considering Dunlap's need for an assistive device

Dunlap argues that the ALJ's RFC assessment is faulty because "it fails to account for his need for assistive devices to ambulate and for swelling in his legs which impede standing and walking." Doc. No. 16, p. 18.

"[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018).[3] To be considered a restriction or limitation, an assistive device "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that [it] is medically necessary" and the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of [it]." *Murphy*, 2013 WL 829316, at *10. In general, an ALJ's finding that an assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission. *Cruz-Ridolfi*, 2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL

---

[3] Report and recommendation adopted, 2018 WL 1083252 (N.D. Ohio Feb. 28, 2018).

6419350, at *11 (N.D. Ohio Nov. 22, 2017)[4]).  Pursuant to SSR 96-9p,

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

1996 WL 374185, at *7 (July 2, 1996).

Here, the ALJ detailed evidence of Dunlap's gait and his use of assistive devices.  The ALJ noted that, in 2017 and the first half of 2018, Dunlap presented with an independent gait.  Tr. 17-18.  X-rays of his lumbar spine showed mild degenerative changes and mild disc space narrowing and an MRI showed mild T2 hyperintensity in the interior endplates at L4 and L5 and likely acute worsening of chronic degenerative changes.  Tr. 18.  Exam findings were mostly normal, although, at some visits, he had a limited range of motion and slight weakness of his left lower extremity.  Tr. 18.  The ALJ discussed his visits to the podiatrist in mid-2018; the diagnosis of a stress fracture in his foot, prescriptions for a "post-op shoe" and cast boot, and crutches for pain while it healed.  Tr. 19.  The ALJ observed that at a pain management visit in August 2018, Dunlap was wearing his walking boot and his provider noted that, anatomically, he should have more flexion of the lumbar spine than he presented with.  Tr. 19.  He was prescribed a TENS machine for neck and back pain.  Tr. 19.  Thereafter, he continued to have normal exam findings regarding his gait, sensation, and reflexes, although he also reported pain.  Tr. 19.

The ALJ detailed Dunlap's leg surgeries from his car accident in December 2018 and noted that he was provided with a wheelchair and advised to avoid weightbearing while his leg underwent "routine healing."  Tr. 19.  He was given a cane for his transition to weightbearing status, and in April 2019 his

---

[4] Report and recommendation adopted, 2017 WL 6389607 (N.D. Ohio Dec. 14, 2017).

surgeon found minimal swelling and a stable knee.  Tr. 19.  The surgeon was "very happy" with

Dunlap's progress and he cleared him for weightbearing as tolerated.  Tr. 19-20.  Dunlap started

physical therapy at the end of April; in May at a pain management visit he stated that his TENS machine

was helping "a lot" and that he could ambulate and perform activities of daily living without devices.

Tr. 20.  Upon exam, he used a cane and limped.  Tr. 20.  In June, he had an antalgic but independent

gait.  Tr. 20.  He had been "out and about to parks" and "events with the kids" and he was doing a lot of

walking at his family's encouragement.  Tr. 20.  At a follow-up with his surgeon in July, he used a cane,

had reduced knee motion due to pain, and the doctor said that he continued to see improvement and gave

him a steroid injection in his knee.  Tr. 20.  Four days later, at a physical therapy visit, Dunlap

ambulated normally without an assistive device.  Tr. 20.  At a neurological appointment in August he

had some weakness and diminished sensation in his right leg and facet tenderness in his cervical and

lumbar spine, but no other pain behaviors or limited spinal mobility was noted.  And at his last visit in

the record, in October 2019, his muscle strength and gait were within normal limits, he did not appear to

be in acute distress, and he had normal neurological findings.  Tr. 20.  The ALJ concluded that, despite

Dunlap's allegations of severe pain and weakness that limited him to walking no farther than a block at a

time, his allegations were not "fully consistent" with the record, explaining,

> his treaters regularly stated that he presented for examinations in no acute distress, with a normal
> gait and with normal or else only slightly diminished lower extremity strength.  Although the
> record does show that he temporarily required the use of assistive devices to walk following his
> December 2018 surgeries, he was apparently able to walk completely independently as of July
> 2019, and the claimant admitted that he was able to take part in activities "doing a lot of
> walking."

 Tr. 21.

Dunlap does not challenge the ALJ's reasoning or characterization of the evidence.  Rather, he

asserts that "the evidence supports additional restrictions on the ability to ambulate and stand" and

reiterates his summary of the evidence regarding his use of a boot while his left foot healed from his

stress fractures.  Doc. No. 16, pp. 18-19.  But the ALJ considered that evidence.  Tr. 18, 19.  Dunlap does not dispute that his use of a walking boot was temporary while his foot healed in 2018 and that he was weightbearing in July 2019 after healing from his right leg surgery.  The record does not show that he still required the use of a walking boot at that time.

Dunlap lists the devices he was prescribed and used after his leg surgery in December 2018—a wheelchair, crutches, and cane (Doc. No. 16, pp. 19-20)—but does not dispute that his ambulation improved after his surgery with time, therapy, and treatment, and that he was ambulating without an assistive device in July 2019.  He concedes, "the current record does not describe the Plaintiff's continuous use of the cane, which is a remaining issue to be resolved by the ALJ."  Doc. No. 16, p. 21.  As described above, the ALJ resolved the issue of whether Dunlap required continuous, permanent use of a cane and found that he did not.  Dunlap argues that evidence in the record shows his "antalgic gait and persistent leg swelling, as well as reliance on orthopedic shoes, a TENS unit, a knee brace, and compression stockings" and complains that his "need for these devices" were not evaluated by the ALJ.  Doc. No. 16, p. 21.  But the ALJ did address his use of a TENS machine (which Dunlap stated helped "a lot") and the "post-op shoe" that he was provided with while the stress fractures in his left foot healed.  Tr. 19, 20.  Although Dunlap referenced a knee brace and orthopedic shoes at his hearing (Tr. 241), he does not cite evidence in the record showing a prescription for those items, whether and how often he used them, and how they impacted his ability to ambulate.

Finally, regarding Dunlap's compression stockings, those items are not a hand-held assistive device to aid in walking or standing.  Although the ALJ did not discuss Dunlap's use of compression stockings, the ALJ noted that at a post-surgical appointment in April 2019 Dunlap had minimal swelling in his right leg.  Tr. 19.  Subsequent appointments with his surgeon and neurologist did not indicate leg edema on physical exams.  Tr. 20.  Dunlap does not dispute that his ability to ambulate improved after

his surgery despite swelling in his leg and there is no opinion evidence in the record assessing functional limitations based on leg swelling.  Dunlap has not described an error by the ALJ; the decision is supported by substantial evidence and must be affirmed.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (the ALJ's decision must be affirmed so long as substantial evidence supports the conclusion reached by the ALJ).

**B. Any error at step five is harmless**

Dunlap argues that the ALJ erred when she relied on VE testimony that was in conflict with the DOT without resolving that conflict as the ALJ is required to do.  Doc. No. 16, pp. 21-23.  He explains that the ALJ's hypothetical question to the VE described an individual who could lift and carry no more than 10 pounds but that the VE identified jobs at the light level of exertion, which is defined in the DOT as occasionally lifting/carrying up to 20 pounds.  Doc. No. 16, p. 22.  Although the VE explained that the standing/walking limitation in the hypothetical (4 hours in an 8-hour day) was in conflict with the DOT and provided support for the jobs she identified despite that conflict, the VE did not identify or provide support for the lifting and carrying conflict.  Doc. No. 16, p. 22.  Because the ALJ relied upon the jobs identified by the VE and did not resolve that conflict, Dunlap asserts, the ALJ's step five finding is erroneous.  Doc. No. 16, pp. 22-23.  Defendant argues that any error is harmless because, notwithstanding the ALJ's more restrictive hypothetical to the VE, the ALJ's RFC assessment in her decision was less restrictive, finding that Dunlap could perform the full lifting and carrying requirements of light work (lifting/ carrying up to 10 pounds frequently and up to 20 pounds occasionally).  Doc. No. 18, p. 17.

Any error with respect to whether the lifting/carrying limitation in the hypothetical posed to the VE was consistent with the DOT is harmless because, in her decision, the ALJ found that Dunlap could perform the full range of lifting/carrying consistent with the DOT's definition of light work.  Tr. 16.  If

23

the VE found that an individual limited to lifting and carrying no more than 10 pounds could perform

the jobs marker and order caller, it follows that an individual able to lift and carry up to 20 pounds could

also perform those jobs.  And the fact that the ALJ's hypothetical to the VE described an individual who

was more restricted that the ALJ's RFC finding is not error.  *See, e.g., Hoag v. Saul*, No. 1:18-CV-

02842, 2019 WL 7040607, at *15 (N.D. Ohio Sept. 27, 2019) ("Where the hypothetical differs from

[the] RFC by presenting a scenario that is more favorable to the claimant (incorporating more functional

limitations that the RFC), it can still serve as substantial evidence supporting the ALJ's decision.").[5]

Thus, remand for further VE testimony regarding whether a restriction is consistent with the DOT when

the ALJ's decision did not find that Dunlap had that restriction "would be an idle and useless formality."

*Hall v. Astrue*, No. 1:09 CV 2514, 2010 WL 5621291, at *14 (N.D. Ohio Dec. 23, 2010)[6] (citing

*Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 669 (6th Cir. 2009)); *Hoag*, 2019 WL 7040607, at *15

(remand not warranted to correct the ALJ's error so that the RFC and hypothetical match; "if the VE

found [Hoag] capable of performing jobs under the more restrictive hypotheticals, removing restrictions

so that the hypotheticals match the RFC determination will not make her less capable of work.").

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: December 7, 2021                          _s/ Jonathan Greenberg_
                                                                Jonathan D. Greenberg
                                                                United States Magistrate Judge

---

[5] Report and recommendation adopted, 2019 WL 7037399 (N.D. Ohio Dec. 20, 2019).

[6] Report and recommendation adopted, 2011 WL 194615 (N.D. Ohio Jan. 20, 2011).

24